590 F.2d 1180
 192 U.S.App.D.C. 64
 NATIONAL MOTOR FREIGHT TRAFFIC ASSOCIATION, INC., et al., Petitioners,
v.
The INTERSTATE COMMERCE COMMISSION and United States of
America, Respondents,
Southern Motor Carriers Rate Conference Drug & Toilet
Preparation Traffic Conference, Intervenors.
 No. 77-1484.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 1, 1978.
Decided Dec. 20, 1978.
 
 Thomas M. Auchincloss, Jr., Washington, D. C., with whom Bryce Rea, Jr., Washington, D. C., and Jeffrey Kohlman, Atlanta, Ga., were on the brief, for petitioners.
 John J. McCarthy, Jr., Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Frederick W. Read, III, Associate Gen. Counsel, I. C. C., Robert B. Nicholson and Frederic Freilicher, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent.
 Daniel J. Sweeney, Washington, D. C., with whom John M. Cutler, Jr., Washington, D. C., was on the brief, for intervenor, Drug & Toilet Preparation Traffic Conference.
 Also R. Craig Lawrence, Atty., I. C. C., Washington, D. C., entered an appearance for appellee, Interstate Commerce Commission.
 Before LUMBARD,* Senior Circuit Judge, United States Court of Appeals for the Second Circuit, and TAMM and LEVENTHAL, Circuit Judges.
 Opinion for the Court filed by LEVENTHAL, Circuit Judge.
 LEVENTHAL, Circuit Judge:
 
 
 1
 Petitioners, associations representing motor carriers of freight, seek review of the construction by the Interstate Commerce Commission (ICC) of an unusual liability limitation provision contained in the carriers' tariffs. Finding the ICC's decision neither arbitrary nor capricious, we affirm.
 
 A. Background
 
 2
 Section 20(11) of the Interstate Commerce Act[1] embodies the common law principle prohibiting limitations by common carriers of their liability for loss or damage to freight caused by them during shipment. The section does contain an exception permitting carriers to limit their liability to a declared or agreed value ("released value") of the goods being transported. In order to take advantage of this option, carriers must make available to shippers two rate schedules one for shipment where the carrier assumes full liability, and one containing lower rates for shipments under the released value provision. ICC approval must be obtained before a released value provision may be employed.[2]
 
 
 3
 On June 9, 1952, motor carrier representatives applied to the ICC for authority to adopt a released value applicable to the transportation of drugs, medicines, toiletries and other products. Their released value provision read:The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding 50 cents per pound for each article.
 
 
 4
 In its released Rate Order No. MC-342 of August 13, 1952, the Commission granted the carriers the requested authority.
 
 
 5
 This released value provision, which was incorporated into the carriers' National Motor Freight Classification,[3] is apparently unique, at least in tariffs subject to the ICC's jurisdiction. In case of total loss, a shipper may recover from the carrier only 50 cents times the number of pounds in the shipment. The problem arises where only partial loss or damage has occurred. Three theories have been advanced as to the meaning of "article" for purpose of determining a carrier's liability limit in this circumstance: A) "article" means each commodity in a shipment; B) "article" means the shipping container; C) "article" means the smallest identifiable unit.
 
 
 6
 As an example, take a 1000 pound shipment of drugs, total actual value $2000.00, consisting of 20 cases containing 10 bottles, each bottle weighing five pounds and having an actual value of $10.00. Assume five bottles from one case are lost.
 
 
 7
 Under Theory A, "article" means "commodity," and the carrier's liability is measured not by the number of pounds of the given commodity that are actually lost or damaged, but by the total number of pounds of the commodity in the shipment. Here, the liability limitation applicable to the entire shipment is $500.00 (50 cents times 1000 pounds). Since the shipper can recover the actual value of the goods lost or damaged up to the liability limitation, he would recover the full $50.00 actual value of the five lost bottles.
 
 
 8
 Under Theory B, "article" means "shipping container." As with Theory A, the carrier's liability is not measured by the number of pounds actually lost or damaged; here, the reference point is the number of pounds of the commodity in each shipping container in which some goods are lost or damaged. Applying Theory B to the example, the shipper's recovery would be only $25.00 (50 cents times the 50-pound weight of the case that contained the lost goods).
 
 
 9
 Finally, under Theory C, "article" means the smallest identifiable unit, and the carrier's liability is measured by the number of pounds actually lost or damaged. Under this theory, the shipper in the example may recover only $12.50 (50 cents times 25 pounds, the weight of the bottles that were actually lost).
 
 
 10
 Theory A, which establishes the highest limit, is the view advanced by the shippers. Theory C, which sets the lowest limit, is advanced by the carriers. Both groups object to Theory B.
 
 
 11
 On December 20, 1973, a petition seeking a declaratory order or interpretation of the provision was filed with the ICC by Intervenor Drug and Toilet Preparation Traffic Conference. That Conference is an association of shippers consisting of the preponderance of drug, medicine, and toiletry manufacturers in the United States. It noted that much of the traffic shipped by its members moves under released value rates, and asserted that the released value provision was ambiguous and that carriers had processed claims for lost or damaged goods under each of the three theories.
 
 
 12
 There ensued extensive administrative proceedings in which each theory prevailed at one time or another.[4] The Commission's final order of March 21, 1977[5] concluded that Theory A was the correct interpretation. It ruled:
 
 
 13
 That in the event of loss or damage to a portion of the shipment, the amount recoverable should be the released value of 50 cents per pound multiplied by the gross shipping weight of each commodity involved, but not more than the loss or damage actually sustained.[6]
 
 
 14
 The carriers seek review.
 
 B. Analysis
 
 15
 In general, the "arbitrary and capricious" standard requires a reviewing court to defer to an agency's judgment so long as it has a rational basis.[7] We accord particular deference when, as here, the subject of review is the agency's interpretation or clarification of its own order.[8] While petitioners advance a number of substantial arguments, we cannot say the ICC's action here lacked rational basis.
 
 
 16
 Petitioners do not challenge the Commission's finding that the released value provision contained an inherent ambiguity that led to divergent application by carriers. In resolving the ambiguity, the Commission took into account a number of considerations.[9] The key factor was the language of the carriers' initial 1952 application, which was incorporated into Released Rate Order No. MC-342. The Commission read the term "article," as it was employed in the application, to connote "commodity." Specifically, the Commission pointed to the application's request for authority to publish agreed valuations on "articles named below" and its listing under the heading " articles" of more than 100 separate classifications of commodities that would be subject to the proposed liability limitation.[10] The initial application and order were certainly appropriate sources of guidance to the meaning of " article" in this particular provision. They put a cast on the problem of interpretation that supports the Commission's ruling as rational, even though at first blush the Commission's construction of "article" to mean "commodity" might seem to strain the normal meaning of "article."
 
 
 17
 Petitioners' principal contention is that an established principle of law requires that carriers' liability for partial loss or damage under a released value provision be determined only by reference to the smallest unit actually damaged, and not by reference to the whole shipment. Petitioners do not expressly argue that § 20(11) establishes the principle.[11] We agree with the Commission's conclusion that, despite carriers' traditional preference for liability limitations based on the smallest identifiable unit, § 20(11) does not prescribe the specific methodology by which a liability limitation must be calculated. Instead, the Commission has discretion under § 20(11) to authorize any form of released value provision, so long as it finds the rates that are based on that provision to be "just and reasonable under the circumstances and conditions surrounding the transportation."[12]
 
 
 18
 Petitioners cite various precedents as establishing the principle of law they advocate. A number of these cases[13] stand only for the proposition that a shipper who agrees to a released value in exchange for a reduced rate is estopped from denying the effectiveness of the liability limitation and claiming the full unreleased value of lost or damaged goods. The concern for fairness to carriers that underlies those opinions does not dictate that any particular interpretation of a given released value provision must control.
 
 
 19
 Western Transit Co. v. A. C. Leslie & Co., 242 U.S. 448, 37 S.Ct. 133, 61 L.Ed. 423 (1917), is more on point. The Supreme Court rejected an argument that the limit of a carrier's liability under a released value provision of "$100 per net ton" was determined by the weight of the whole shipment of 25 tons ($2500) rather than the one ton actually lost ($100). The Court said, "This construction does violence to the language used and is unreasonable. The valuation clause fixes not an arbitrary limit of recovery, but a ratio." Id. at 454, 37 S.Ct. at 136. Western Transit must be read in the light of the limitation provision there involved one with no language even arguably pointing to a whole shipment standard. Here, there was the additional element of the phrase "for each article." The Commission was therefore presented with a question of interpretation not raised by the less ambiguous terms of the Western Transit provision.
 
 
 20
 Much of petitioners' argument is directed at the Commission's assertedly erroneous application of the principles of construction that govern the interpretation of ordinary contracts. To be sure, the released value provision resembles a contract it is phrased in terms of an agreement, and consideration is present in the form of a reduced rate for the transportation of goods in exchange for a limit on potential recovery in the event of loss or damage. But the existence of a "bargain" does not dictate the means by which the terms of the bargain are to be interpreted. The court accords some deference to an agency with special cognizance over a regulated industry even when the issue is one of interpretation of a contract reached by the parties and agency involvement is limited to acceptance of a filing.[14] The deference must be even greater where, as here, the pertinent language, though initiated by the carriers' filing, is incorporated into a Commission order. For such a "bargain," it is appropriate for the Commission to apply its informed judgment based on its appraisal of the interests that underlie the formulation of transportation policy.
 
 
 21
 Petitioners assail the Commission's invocation of the conventional contract doctrine that uncertainties are to be construed against the maker (in this case, the carrier),[15] claiming that the doctrine does not apply where the interpretation that results is contrary to the ordinary meaning of a term. In a similar vein, petitioners say that the Commission's consideration of the current impact on shippers,[16] whose products have significantly increased in value yet remain subject to the released value provision established in 1952, violates a principle that the quality of consideration is not to be considered in interpreting a contract. While these principles are not without relevance, the Commission's decision need not rest merely on contract doctrine, but may be rooted in sound transportation policy. In our view the Commission did not act arbitrarily in choosing to construe the terms of the released value provision against the carriers that advanced it. Nor was the agency barred from considering the position of shippers today to be relevant in interpreting the provision.
 
 
 22
 Petitioners also allege that the Commission's holding will foster unjust discrimination among shippers because it permits potential recovery for loss to vary according to the volume of goods shipped. The Commission concluded that this was not discrimination of the sort condemned by the Interstate Commerce Act,[17] and we do not disturb that ruling. It is congruent with the ICC's past approval of released value provisions that measured liability by reference to the shipping package,[18] for such provisions also permit, though to a lesser degree, variation in potential liability on the basis of volume of shipment, and depart from the concept of the smallest identifiable unit actually damaged. The Commission possesses broad discretion to determine claims of unjust discrimination.[19] We cannot say that this discretion was abused.
 
 
 23
 We are sensitive to the nagging concerns of unfairness that seem to underpin petitioners' position. They presented at the administrative proceedings numerous statements by carrier claim representatives purporting to show that it was the practice of the preponderance of motor carriers to process claims for partial loss or damage according to Theory C.[20] The carriers may well feel that the Commission's decision deprives them of the benefit of a bargain they thought they had struck in 1952. Yet, the Commission has interpretative discretion.
 
 
 24
 However, nothing precludes the carriers from seeking modification of the released value provision or an increase of the rates under the existing provision, to reflect the additional costs imposed on the carriers by the Commission's decision.[21]
 
 
 25
 Petitioners assert that hardship may result from retroactive application of the order, pointing to three class actions[22] filed by shippers seeking recovery of the difference between claims previously paid under Theory C and amounts that should have been paid under the Theory A standard established by the Commission's order. While the question of retroactive applicability may deserve further study by the Commission, it was not before the Commission in this proceeding, and we do not address it.
 
 C. Conclusion
 
 26
 We have recently had occasion to remark in a similar context that "(o)ur task is not the same as that of a court that construes a contract between parties, with freedom to decide for itself what is the proper construction without any deference to other sources. Here the pertinent doctrine bids us sustain the agency's interpretation of its own order unless it is arbitrary or capricious."[23] This precept has guided us in the instant case. We have found no basis on which to disturb the Commission's decision. Accordingly, its order is
 
 
 27
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 Circuit Judge TAMM did not participate in the decision of this case.
 
 
 [1]
 49 U.S.C. § 20(11) (1970). Section 20(11) applies to motor carriers under § 219 of the Act, 49 U.S.C. § 319 (1970)
 
 
 [2]
 49 U.S.C. § 20(11) (1970). The liability provision of § 20(11) has recently been revised and codified, without substantive change, and enacted as 49 U.S.C. § 11707(a), by P.L. 95-473, 92 Stat. 1337 (1978). The released value provision has been codified as 49 U.S.C. § 10730. For convenience, discussion in the text reflects the language of the old provisions, with cross-references to the new statute provided in the notes where appropriate. See P.L. 95-473, § 3(b) (reference to old provision of Interstate Commerce Act deemed a reference to corresponding provision in codification)
 
 
 [3]
 The National Motor Freight Classification establishes ratings for various classes of commodities based on their unreleased values, as well as other factors. These ratings form the basis of the rates charged for shipment of the commodity. A separate rating applies to commodities shipped under the released value provision approved in Released Rate Order No. MC-342. See J.A. at 41-82 (statement of Frank T. Grice)
 
 
 [4]
 By order of May 7, 1974, the Commission instituted a proceeding to examine the question. J.A. at 20. The Administrative Law Judge's initial decision of December 12, 1974, concluded that Theory C was the correct interpretation. J.A. at 294-329. Exceptions were taken by the Drug and Toilet Preparation Traffic Conference and, on July 3, 1975, ICC Review Board No. 4 decided that the correct interpretation was Theory B. J.A. at 330-372. Both the Drug Conference and the carriers' representatives sought review of that determination, and, on July 12, 1976, Division 2 of the Commission, acting as an appellate division, held that the initial decision of the ALJ, adopting Theory C, was correct. J.A. at 374-89. Following the Drug Conference's petition for reconsideration, Division 2, on March 21, 1977, reversed its earlier decision and entered the order adopting Theory A that is now the subject of review
 
 
 [5]
 No. 35944, Drug and Toilet Preparation Traffic Conference Petition for Declaratory Order Liability Limitation, 353 I.C.C. 536 (1977)
 
 
 [6]
 Id. at 547
 
 
 [7]
 5 U.S.C. § 706(2)(A) (1976); Ethyl Corp. v. EPA, 176 U.S.App.D.C. 373, 406-07 & n. 74, 541 F.2d 1, 34-35 & n. 74, Cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976)
 
 
 [8]
 Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Chesapeake & O. Ry. Co. v. United States, 187 U.S.App.D.C. 241, 571 F.2d 1190 (1977)
 
 
 [9]
 In adopting a construction of the word "article" as used in our 1952 order in No. MC-342 and in related items of the National Motor Freight Classification, we have given consideration to the circumstances surrounding the transportation of the property involved, including the context in which the word was used in the application to which the order responds, the language used in the exceptions and commodity tariffs naming released rates on the same list of commodities, and the possible impact of such a construction upon the carriers and members of the shipping public. We are also mindful of the well-established rule that all tariffs are to be construed according to Their language; that the intention of the framers, although important, is not necessarily controlling; that their terms should be so clearly stated as to avoid misrepresentation or misunderstanding; and that in the case of ambiguity they must be construed against the maker
 
 
 [353]
 I.C.C. at 540 (emphasis in original)
 
 
 [10]
 Id. at 551-55
 
 
 [11]
 Section 20(11), in pertinent part, authorizes the Commission, upon application by carriers, to
 maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released.
 49 U.S.C. § 20(11) (1970), Revised and recodified as 49 U.S.C. § 10730.
 
 
 [12]
 Id. See 353 I.C.C. at 540
 
 
 [13]
 E. g., American Railway Express Co. v. Lindenburg, 260 U.S. 584, 43 S.Ct. 206, 67 L.Ed. 414 (1923); Kansas City Southern Ry. Co. v. Carl, 227 U.S. 639, 33 S.Ct. 391, 57 L.Ed. 683 (1913); Hart v. Pennsylvania R. Co., 112 U.S. 331, 5 S.Ct. 151, 28 L.Ed. 717 (1884); Sommer Corp. v. Panama Canal Co., 475 F.2d 292 (5th Cir. 1973); Gellert v. United Airlines, 474 F.2d 77 (10th Cir. 1973)
 
 
 [14]
 See New England Power Co. v. FERC, 187 U.S.App.D.C. 264, 270 & n. 23, 571 F.2d 1213, 1219 & n. 23 (1977), and cases cited therein
 
 
 [15]
 See 353 I.C.C. at 540, Quoted in note 9 Supra
 
 
 [16]
 Id. at 542, 546
 
 
 [17]
 353 I.C.C. at 546-47. See Interstate Commerce Act, §§ 2, 216(d), 49 U.S.C. §§ 2, 316(d) (1970), Revised and codified as 49 U.S.C. § 10741
 
 
 [18]
 E. g., Metals or Metal Alloys, 311 I.C.C. 617, 618 (1960)
 
 
 [19]
 See Nashville, C. & St. L. Ry. v. Tennessee, 262 U.S. 318, 322, 43 S.Ct. 583, 67 L.Ed. 999 (1923); City of Galveston v. United States, 257 F.Supp. 243, 246 (S.D.Tex.1966), Aff'd, 386 U.S. 269, 87 S.Ct. 1018, 18 L.Ed.2d 38 (1967)
 
 
 [20]
 J.A. at 93-221. The Commission did not give great weight to the carriers' presentation, asserting that "no supporting evidence" for the proposition was presented. The Commission added, "On the other hand, (the Drug Conference) established by competent evidence that some (carriers) settle claims for partial loss or damage on the basis of the total weight shipped times the unit valuation." It also emphasized the absence of probable adverse impact on the carriers from its ruling: "The fact that those (carriers settling claims on a per shipment basis) are able to honor claims on a basis favorable to shippers without noticeable financial impact demonstrates that other carriers should be able to pursue the same policy with respect to the commodities at issue without any fear of financial jeopardy." 353 I.C.C. at 546
 
 
 [21]
 The Commission's observation that adopting Theory A would not work a financial hardship on the carriers, See note 20 Supra, may reflect a conclusion that present rates under the released value provision are adequate. However, the adequacy of the present rate structure was not directly before the Commission in this proceeding and a fresh look may be justified
 
 
 [22]
 See Brief for Petitioners at 12 & n. 4
 
 
 [23]
 Chesapeake & O. Ry. Co. v. United States, 187 U.S.App.D.C. 241, 245, 571 F.2d 1190, 1194 (1977)